[Civ. No. 3060. Third Appellate District.—June 11, 1926.]

ORANGE COVE WATER COMPANY (a Corporation), Respondent, v. BETTIE SAMPSON et al., Appellants.

[1] VENDOR AND VENDEE—CONTRACT TO CONVEY—EQUITABLE ESTATE IN VENDEE.—A contract to sell and convey real property, if enforceable, has the effect of vesting the equitable estate in the vendee, leaving in the vendor the dry legal title. It is in effect a grant of the whole beneficial interest in the land.

[2] ID.—EQUITABLE TITLE—SUBSEQUENT ENCUMBRANCE BY VENDOR.—After the owner of real property has entered into a valid and enforceable contract to sell and convey said property to several vendees as tenants in common, he has no right to burden or charge any of the lands embraced within said contract of sale with any easement or other encumbrance; and where the said vendees are not in default under said contract, but they desire to divide their holdings, the making of a new arrangement whereby a new contract of sale is executed by the vendor, which contract is identical in form with the first, except that the parties vendees are not all the same, does not have the effect of divest-

1.   See 25 Cal. Jur. 603; 27 R. C. L. 464.

ing or destroying the equitable title which the vendor, by the original agreement, conveyed to the vendees.

[3] ID.—PRIORITY OF RECORDATION—NOTICE—KNOWLEDGE.—Neither the fact that the said agreement of sale was not recorded nor the fact that the deed from the vendor purporting to convey a right of way across the lands in question was recorded prior to the recordation of the deed executed pursuant to the provisions of the agreement of sale was of any avail to the grantee in the deed purporting to convey said right of way, where said grantee not only had notice, but had actual knowledge, at the time it took said deed, of the fact that the vendees under the agreement of sale were the equitable owners of the property and were in actual possession thereof.

[4] ID. — AGREEMENT FOR WATER COMPANY — GRANTS OF RIGHTS OF WAY—INTENT—PRESUMPTION.—Where the equitable owners in possession of a tract of land under a contract of sale, in discussion with reference to an adequate water supply for irrigation and domestic purposes, agree among themselves that water pipe-lines should be laid over and across such parts of the acreage embraced within the sale contract as would properly subserve the needs of the lands and the vendees in that respect, and in following out that purpose they organize a water company and then, in accordance with the previous understanding, make specific grants of rights of way, and water-pipes are laid upon said rights of way over and across different parts of the lands, it will be presumed that such specific grants involved the granting of the water company of all that the parties intended or agreed to convey in that particular and for that particular purpose.

[5] ID.—ESTOPPEL—CERTAINTY—INTENT.—Upon the doctrine of equitable estoppel one may be divested of a substantive right of property, but estoppel by conduct, whether such conduct consists of representations, either express or implied, must be plain, not doubtful, or matter of questionable inference. Certainty is essential to all estoppels; and courts will not readily suffer a man to be deprived of his property where he had no intention to part with it.

(1) 39 Cyc., p. 1302, n. 17.   (2) 19 C. J., p. 964, n. 29; 21 C. J., p. 202, n. 36; 29 Cyc., p. 1550, n. 6, 16; 39 Cyc., p. 1302, n. 17, p. 1303, n. 20, 22, p. 1304, n. 24, p. 1621, n. 5, p. 1663, n. 19 New. (3) 21 C. J., p. 881, n. 61; 39 Cyc., p. 1302, n. 17, p. 1755, n. 40, p. 1756, n. 41.   (4) 21 C. J., p. 1139, n. 96, p. 1252, n. 93; 40 Cyc., p. 827, n. 86.   (5) 21 C. J., p. 1139, n. 96.

5.  See 10 Cal. Jur. 627.

APPEAL from a judgment of the Superior Court of Tulare County. W. B. Wallace, Judge. Reversed.

The facts are stated in the opinion of the court.

Edward F. Treadwell, R. S. Laughlin and J. A. Chase for Appellants.

Farnsworth, McClure & Burke for Respondent.

HART, J.—This is an action to quiet the alleged title of the plaintiff to a right of way in, over, and upon lot 13 of certain real property of the defendants (specifically described in the complaint), for the construction and maintenance thereon of pipe-lines to be used in connection with and as a part of a system inaugurated by plaintiff for the transportation of water for irrigation and domestic purposes "over, through and across" said lot 13 and other real property immediately contiguous thereto. The complaint also prayed for the issuance of a temporary writ of injunction enjoining defendants and their agents, servants, and employees from in any manner interfering with or preventing plaintiff from laying, constructing, and maintaining pipelines upon, over, through, and across said real property. A temporary injunction as prayed for was granted.

Issue was joined upon the question of plaintiff's ownership of the right referred to, the trial was by the court, sitting without the advisory aid of a jury, and judgment passed for plaintiff, decreeing that it (plaintiff) was the owner of said right of way or easement and that the temporary injunction be made permanent.

The appeal is by the defendants from said judgment and is supported by a record made up in conformity to section 953a of the Code of Civil Procedure.

The facts, generally stated, are: By a decree in partition entered in the superior court of Tulare County, on the seventeenth day of February, 1887, between the heirs of one Hugh Hamilton, deceased, James L. Hamilton became the owner of certain lands embraced within and constituting what is designated and known as "Hamilton Colony," in said county. Said James L. Hamilton (to be hereinafter referred to as Hamilton), on the eighth day of December,

1910, entered into a written contract with W. W. Collins, W. D. Collins, B. H. Bendheim, and the appellant, Arthur F. Sampson, whereby he agreed to sell and the other parties agreed to buy a certain portion of the land in said colony, including said lot 13, it being provided in said contract that the purchase price ($5,644.80) should be paid, after the payment of $1,411.20 "upon the execution and delivery of the agreement," in installments of a like sum in December of each of the years 1911, 1912, and 1913. Immediately upon the execution of said contract the purchasers jointly took possession of the lands and proceeded to plant the same to orange and other trees, and Bendheim, W. W. Collins, the defendant A. F. Sampson, and for a limited period W. D. Collins, from the time of the taking by them of the possession of the lands until a date in 1911—a period of about three years—worked or operated the same "as one body, known as the 'C. B. S. Company,' a fictitious name," testified W. W. Collins. Subsequently, W. W. Collins, Bendheim, and A. F. Sampson agreed to and did purchase the equitable interest of W. D. Collins in the contract of December 8, 1910, and further agreed to the making of a new contract in accord with the result of such purchase, but embracing, as W. W. Collins testified, "practically the same terms and conditions as were contained in the original written agreement." Accordingly, a written contract was prepared, and, although bearing the same date as the original contract (December 8, 1910), was not executed until September 18, 1911. This contract differed from the original in these particulars only: The name of W. D. Collins was eliminated therefrom as one of the vendees, or, in other words, he was not a party thereto, and the individual interests in the lands and the precise liability, respectively, of W. W. Collins, Bendheim, and said Sampson were and are defined. After the substituted contract was executed by the various parties (now quoting from the Appellants' Opening Brief, which contains an accurate statement of the facts of the controversy), "a deed, dated August 21, 1911, was executed by James L. Hamilton and his wife, conveying the lands covered by the contract of sale, in the proportions agreed upon in the substituted contract, to Sampson, Bendheim and W. W. Collins. This deed was executed September 18, 1911, and was delivered to the First National Bank of

Visalia, together with the substituted contract and certain escrow instructions which directed the delivery of the deed upon the terms of the contract being fully complied with. The escrow instructions were dated September 18, 1911, and are indorsed as received by the cashier of the bank on that date. The record does not show the exact date the final payments were made and the deed delivered, but it does show that both these steps took place and the deed was recorded on August 5, 1914.

"On September 22, 1913, Sampson, Bendheim and W. W. Collins mutually agreed that the land which they jointly held should be partitioned and divided, and pursuant to this agreement W. W. Collins and B. H. Bendheim executed and delivered to the appellant Sampson a bargain and sale deed to that part of the land known as lot 13. This deed was dated September 22, 1913, and was executed and delivered the following day. It will thus be seen that the title of the appellant Sampson was initiated on December 8, 1910, and finally culminated on August 5, 1914—he and his associates being in possession of the property during all of that time.

"The Orange Cove Water Company was organized in 1911 by the same parties, to-wit: W. W. Collins, W. D. Collins, B. H. Bendheim and the appellant Arthur F. Sampson for the purpose of supplying water to the same land which they had jointly contracted to purchase, and including Lot 13. These parties were the stockholders and W. W. Collins was President, and B. H. Bendheim was Secretary. The system of the company has been supplying water to these lands since the spring of 1911.

"On September 15 and 18, 1911, Sampson, Bendheim, W. D. Collins and W. W. Collins executed a group of deeds to the water company conveying various rights of way over the land, which rights of way are not involved in this action. These deeds were all drawn by the same attorney (E. C. Farnsworth), acknowledged before the same notary public, and recorded on the same date by the same person (W. W. Collins). They are as follows:

"A. Deed from Bendheim, Sampson, W. W. Collins and W. D. Collins, as individuals and as co-partners doing business under the firm name of C. B. S. Citrus Company, to Orange Cove Water Company conveying right of way *for*

*existing pipe line* across lots 9, 12 and 13 to Southwest corner of lot 15; thence East to boundary line between lots 13 and 14.

"B. Deed from Sampson to Orange Cove Water Company conveying rights of way for pipe line along lines of lots 15, 7 and West half (½) of lot 4.

"C. Deed from Bendheim to Orange Cove Water Company conveying rights of way for existing pipe line over specifically described property.

"D. Deed from W. W. Collins to Orange Cove Water Company conveying rights of way for existing pipe line over specifically described property.

"E. Deed from W. D. Collins to Orange Cove Water Company conveying rights of way for existing pipe line over certain specifically described property.

"F. Deed from Bendheim, Sampson, W. W. Collins and W. D. Collins, as individuals, and as co-partners, to Orange Cove Water Company conveying portion of lot 9 containing well, together with pumping plant, equipment and pipe lines.

"The rights of way thus granted are not in dispute in this action. These rights of way are occupied and enjoyed by the company and are not questioned, or in any way involved in this suit."

On the same date (September 18, 1911) that the contract whereby Hamilton and W. W. Collins, Bendheim, and defendant Sampson executed the contract to take the place of the contract of December 8, 1910, for the sale of the lands described in both said writings, Hamilton and his wife executed a deed to the plaintiff, the same having been, at the request of W. W. Collins, recorded in the office of the recorder of Tulare County, on the twenty-third day of September, 1911, whereby they (Hamilton and wife) conveyed to it (plaintiff) a right of way to maintain certain pipes over and across certain property in Hamilton colony, which right of way had previously been conveyed by Sampson and his associates, said deed, however, containing the following provision: "Also the right of way to lay, construct, maintain, operate, repair or remove any necessary pipe lines for the transportation of water for irrigation and domestic purposes in said Colony over and through any part of the lands of said Hamilton Colony owned by the first parties or either of them."

It is upon the foregoing provision of the said deed that the plaintiff undertakes to support its claim to the particular right of way with which this action is concerned. Specifically explained, the contention of the plaintiff is that, at the time of the execution of said deed, Hamilton was the owner of lot 13, which, as seen, is embraced within Hamilton colony, and that the effect of the blanket provision of said deed was, therefore, to convey to the plaintiff an impregnable title to the particular right of way involved in this action. In attempting to sustain this contention counsel for the plaintiff start with the assumption that the agreement of sale of December 8, 1910, was extinguished or its provisions set at naught by the written agreement of sale of September 18, 1911, and that, therefore, the sole source of any rights acquired by W. W. Collins, Bendheim, and defendants in the lands described in said agreements is in the said agreement of September 18, 1911. In other words, counsel maintain that the last-mentioned agreement worked a novation or a substitution of the later agreement for the original, thereby extinguishing the latter and necessarily all the obligations thereby imposed upon either the first party or the second parties thereto. Upon that assumption the argument is advanced, quoting from respondent's brief: "Therefore, at the moment of delivery of the right of way deed, Hamilton was the owner of said Lot 13, and as he made and delivered the right of way deed and the contract of sale as a part of the same transaction it must follow that the contract of sale was made and accepted subject to the right of way deed."

It is further maintained, upon testimony received in the case to the effect that when the new arrangement evidenced by the later written agreement was made A. F. Sampson and his associates expressed the desire that the blanket right of way deed should be given by Hamilton affecting any lands he might then have owned in Hamilton Colony, that said deed "was taken with his (said Sampson's) consent and approval, and, therefore, subjects him as well as all other parties to the land purchase contract to its provisions." Proceeding further, counsel, in endeavoring to support the hypothesis that Hamilton, at the time of the examination and delivery of his blanket deed to the plaintiff, was the owner of lot 13, argue as follows: "On the

same day that he executed and delivered the land purchase contract and the right of way deed, Hamilton and his wife executed a deed of grant conveying the property mentioned in said contract to W. W. Collins, Bendheim and Sampson, but he placed this deed in conditional escrow with First National Bank of Visalia, and the grantees named therein did not receive it until 1914. The escrow instructions expressly provide that said deed is to be delivered only upon performance by the grantees of all the conditions of the contract and if the same were not performed, then the deed should be returned to Hamilton. This was a delivery in escrow on condition subject to return of the deed to Hamilton. It was not a valid or complete delivery of the deed in escrow.''

[1] By the contract of sale of December 8, 1910, A. F. Sampson and his associates, including W. D. Collins, jointly acquired an equitable estate in the lands described in said instrument. "Such a contract to convey, if enforceable, has the effect of vesting the equitable estate in the vendee, leaving in the vendor the dry legal title. It is in effect a grant of the whole beneficial interest in the land." (*Jackson* v. *Torrence,* 83 Cal. 521, 537 [23 Pac. 695] ; *Keese* v. *Beardsley,* 190 Cal. 465, 473 [213 Pac. 500] ; *Gilbert* v. *Sleeper,* 71 Cal. 290, 293 [12 Pac. 172] ; *Baldwin* v. *Morgan,* 50 Cal. 585, 587, 588; *McClellan* v. *Lewis,* 35 Cal. App. 64, 68 [169 Pac. 436].) [2] The question, then, is: Did the making of the new arrangement as to said lands by the parties to the said agreement of sale have the effect of divesting or destroying the equitable title which Hamilton, by the original agreement, conveyed to the vendees? There is afforded by the record here none other than a negative answer to that question. There is no evidence or even pretense that the vendees violated or breached any condition or covenant of the original agreement. There is no claim here, nor does the record afford justification for any such claim, that the vendees failed to comply with the exactions of said agreement as to payments on the purchase price of the lands or violated any condition or covenant of the contract. There was, in other words, no act or default upon the part of the vendees which operated or would operate to forfeit their rights under the contract or work a reversion of their equitable interests or any thereof to the grantor.

The sale by W. D. Collins of his equitable interest in the lands was to two of his cotenants and not to Hamilton. The so-called "new" contract was not in fact a new contract. There was no change in the purchase price, nor were there changes in the terms and conditions of the instrument which affected the rights of Hamilton in any manner. The vendees, with the exception of one, who, as seen, transferred his interest to two others of the original vendees, were the same. The writing amounted only to an agreement between the vendees themselves with respect to the quantity and the character of the estate or interest in the lands which they were to hold therein and also as to the number of tenants. Therefore, at the time the Hamiltons executed and delivered the plaintiff their deed conveying to it (plaintiff) a right of way "over and through any part of the lands of said Hamilton Colony owned by the first parties (the Hamiltons) or either of them," the defendant A. F. Sampson and his associates were the equitable owners of the lands described in the contract of sale (39 Cyc. 1302, 1303), and, by virtue of the terms of said contract, were vested with the right to the possession of said lands "to the exclusion of all others." (Civ. Code, sec. 654; *Estate of Stanford*, 126 Cal. 119 [45 L. R. A. 788, 54 Pac. 259, 58 Pac. 462]; 29 Cyc. 1549.) As before stated, the rule in equity is that by a contract of sale of real property for an adequate and sufficient consideration the vendee acquires an equitable title to such property and thereby becomes the equitable owner. The vendee, from the time of the making of such contract, is by equity treated as trustee of the purchase money for the vendor, while the latter is regarded as holding the land in trust for the purchaser as security for the payment of the purchase price until a conveyance of the legal title to the vendee is finally made. (21 Cor. Jur. pp. 201, 202; *Crescent Canal Co.* v. *Montgomery*, 143 Cal. 248 [65 L. R. A. 940, 76 Pac. 1032]; *McClellan* v. *Lewis*, 35 Cal. App. 64, 68 [169 Pac. 436]; *Baldwin* v. *Morgan*, 50 Cal. 585.) It is thus perfectly clear that the Hamiltons, when they made and delivered to plaintiff the blanket right of way deed of September 18, 1911, had no right to burden or charge any of the lands embraced within the contract of sale in question with an easement or other encumbrance. It is manifest from the foregoing considerations that the fact that

the Hamilton right of way deed was recorded in the county recorder's office prior to the like recordation of the deed conveying lot 13 to Sampson has no material bearing upon the decision herein. As seen, lot 13 was not specifically mentioned in the Hamilton blanket deed and could not be included therein under the blanket provision for the reason, as pointed out above, that it did not fall within the general provision of said deed granting a right of way over and through any lands of Hamilton Colony then *owned* by Hamilton. Indeed, it is clear, from the fact that Hamilton had actual knowledge of the fact, as did all the parties, that the equitable title to lot 13 had previously been conveyed to Sampson and his associates, and from the further fact that, in the discussion among the parties of the matter of granting rights of way for the laying of water-pipes over and across certain of the lands embraced within the contract of sale, lot 13 was never mentioned or referred to, that it was not the intention of the Hamiltons, nor within the contemplation of any of the parties when said deed was executed and delivered to plaintiff, to include said lot within the purview of the blanket provision of said deed. It will be borne in mind that W. W. and W. D. Collins, and Sampson and Bendheim and their wives, on the same date on which the contract of sale was re-executed at the request of the vendees so as to conform to the new arrangement made between the latter, as above explained, conveyed by deed to the plaintiff the rights of way for the water-pipes which were and previously had been laid and in place over and through the lands described in the contract of sale; that, among these deeds, was one by defendants Sampson for the then existing right of way over and through lot 13 and along which water-pipes had previously been laid and which were then in the ground and in use; that, at the time those deeds were executed, there was no claim that Hamilton then owned lot 13.

[3] As to the deed by Hamilton to Sampson and associates conveying the lands embraced within the contract of sale, it is clear that, until the terms and conditions of said contract were fulfilled by the vendees therein, it was of no legal force, since there was no delivery thereof. It was deposited with the contract of sale in escrow, with instructions that it be delivered to the vendees when they had fully complied with all the conditions or the terms of the contract

and only then. But the defendant Sampson and his associates acquired their interests in the lands solely through the contract of sale and not through the deed. Whatever might have been the specific reason prompting the act of depositing the deed in escrow with the contract of sale, it is obvious that so depositing it was not necessary to the vesting of the equitable title of the lands in the vendees. Under the circumstances here revealed, however, the fact of the recordation of the Hamilton deed prior to the recordation of the deed from Hamilton to the vendees, or the fact that the contract of sale was not recorded at or prior to the time that the first-named deed was recorded, could be of no avail to plaintiff, since the evidence without conflict shows that the plaintiff, whose officers and members were composed entirely of the vendees in the contract of sale, not only had notice, but actual knowledge, at the time it took the Hamilton right of way conveyance, of the fact that the said vendees were the equitable owners of the lands described in the contract of sale, including, of course, lot 13, and were in actual possession thereof from the time of the execution of the contract of sale to the date of the making of the Hamilton deed, and, it may be added, that so far as it is to be learned from the record, they continued to maintain such possession down to the time of the trial of this action. The law as to this subject of notice is well understood. A general statement of the rule regarding it is declared in section 19 of the Civil Code and its application illustrated in the following named cases and text-books: *Talbert* v. *Singleton,* 42 Cal. 390, 395; *Reclamation Dist. No. 551* v. *Van Loben Sels,* 145 Cal. 181 [78 Pac. 638]; *Crescent City Canal Co.* v. *Montgomery,* 143 Cal. 248 [65 L. R. A. 940, 76 Pac. 1032]; Devlin on Real Estate, Deeds, sec. 760; *Crooks* v. *Jenkins,* 120 Iowa, 317 [104 Am. St. Rep. 326, 100 N. W. 82.]

[4] There is a suggestion of an estoppel as against the defendants, but we find no merit therein. It is true that the Water Company was organized by the defendant A. F. Sampson and associates immediately upon the execution of the contract of sale and the taking of possession thereunder by the vendees, and that, in the preliminary discussion among the vendees as to the necessity for an adequate water supply for the lands for irrigation and domestic purposes, it was agreed among them that water pipe-lines should be

laid over and across such parts of the acreage embraced within the sale contract as would properly subserve the needs of the lands and the vendees in that respect. But in following out the scheme thus proposed or agreed upon after the company was organized, the vendees made to plaintiff, in accord with a previous understanding, specific grants of rights of. way, and water-pipes were laid over and across different parts of the lands, including lot 13, and were used down to the time that plaintiff undertook to and, under the order of the court enjoining the Sampsons from interfering with plaintiff's activities in that particular, did, in fact, exercise the claimed right of entering upon lot 13 and laying thereon another water pipe-line. It is not claimed—at any rate, the evidence does not show that any such claim was made—that any express understanding or agreement was had between the parties that any other pipe-line than that already existing when the deed conveying the same to plaintiff was executed should or was to be installed and maintained in, upon or across lot 13. Thus it is to be assumed that at the time the deed conveying the right of way for the existing water pipe-line over said lot was given plaintiff the intention was thus to limit the right of plaintiff to use said lot for that purpose to the right expressly granted. In other words, since the grants of the rights of way for pipe-lines over said lands were the culmination of an agreement between the vendees to inaugurate the water system to be used for their mutual benefit, it is to be presumed that such grants involved the granting to plaintiff of all that said parties intended or agreed to convey to it in that particular and for that purpose. Such is always the construction which must be given to grants or any instrument in writing expressly delimiting its own scope. If, then, the defendants can at all be charged with an estoppel, whereby they are to be precluded from denying the claimed right of plaintiff to a right of way for a pipe-line over lot 13 other than that already expressly granted, it is not an estoppel arising by contract, either directly or incidentally— that is, not one so arising out of the agreement to organize the water company, for, as seen, that agreement, so far as such rights of way were concerned, was fully consummated and at an end—but, if any estoppel at all is available to plaintiff as against defendants, it is one by conduct. There

is, though, no ground afforded by the record upon which an estoppel by conduct as against defendants can be predicated. Indeed, there is no element of estoppel by conduct present here. There is no evidence of any act or words or conduct or false representation of any fact on the part of A. F. Sampson subsequent to the granting of the rights of way above spoken of or subsequent to the time the interests of the respective vendees in the lands were segregated and divided into several interests and assigned to the vendees in severalty and as such defined, whereby and wherefrom the plaintiff or its officers could have been led to the belief or the understanding or to infer that said Sampson 'intended or even intimated an intention that it (plaintiff) would be permitted to install and maintain a pipe-line along any other right of way over and across lot 13 than that which had already been expressly granted. The estoppel sought to be invoked is wanting in definiteness in several respects as well as in certainty. According to its theory, the plaintiff is entitled to an easement for the purpose explained over any part of lot 13 which it (plaintiff) may deem the more advantageous to its purposes. The defendants, according to that theory, are without right to interfere or to suggest any particular route over said lot which may be adopted. Not only is this so, but the theory seems to be that plaintiff is not limited as to the time within which the right may be asserted or put into practical operation. The easement, in other words, may be a charge or burden upon lot 13 interminably or forever, subject to be exercised at any time. That this is the theory of the plaintiff is evidenced by the fact that the exercise of the alleged right was not attempted until the lapse of a period approximately of eleven years from the organization of the Water Company and over five years from the time (February, 1916) defendant A. F. Sampson severed his connection with and thereby relinquished to his cotenants whatever interest he had or owned in the plaintiff. But, regardless of the last-mentioned propositions, which, perhaps, would go more to the question of laches than that of the uncertainty of the claimed estoppel, it is clear that an attempt to invoke an equitable estoppel here would be futile because the estoppel claimed is lacking in that element of certainty necessary to impart to it virility and force. [5] Naturally, since upon the doctrine of

equitable estoppel one may be divested of a substantive right of property, the rule is that estoppel by conduct, whether such conduct consists of representations, either express or implied, ''must be plain, not doubtful, or matter of questionable inference. . . . *Certainty* is essential to all estoppels. The courts will not readily suffer a man to be deprived of his property where he had no intention to part with it.'' (Bigelow on Estoppel, 5th ed., pp. 570–578.)

The judgment is reversed.

Plummer, J., and Finch, P. J., concurred.