[Civ. No. 21815.   Second Dist., Div. Two.   Mar. 27, 1957.]

LENA R. BOLEN, Appellant, v. MARTHA E. PARKS et al., Respondents.

Chas. L. Nichols, Robert R. Mallicoat and Christopher Hall for Appellant.

F. Millar Cloud, Lyndol L. Young and H. Elliot Pownall, Jr., for Respondents.

FOX, J.—This is an action for declaratory relief. Plaintiff seeks a declaration that she is the owner of a 40 per cent proprietary interest in a garden product known as Black Magic, and in a joint venture with defendants for the manufacture and sale of such product. Defendants, on the other hand, deny that plaintiff has any interest in Black Magic or in any such venture and contend that plaintiff's investment was in the stock of Three Way Distributors, Inc., through which Black Magic was distributed. The trial court

determined that plaintiff never acquired any interest in Black Magic or in any joint venture; that her investment was in the stock of Three Way Distributors, Inc. She appeals from the judgment.

For some years prior to the transaction here under review, plaintiff, in cooperation with her husband who was a retired doctor, operated a nursery on the rear of their property in North Hollywood.

Defendant Parks was a saleslady of nursery supplies. She called on the trade and, in that capacity, became well acquainted with Dr. and Mrs. Bolen.

Early in 1949 defendant Parks, with the assistance of defendant Barnes, developed this new gardening product. It was manufactured by Parks Manufacturing Company, which was simply a fictitious name under which Miss Parks operated.[1] It was marketed through Three Way Distributors, Inc., which had 2,000 shares of stock issued and outstanding. Of these shares, Miss Parks owned 1,300. The remaining shares were owned by Mr. Cloud, attorney for the corporation, and Mr. and Mrs. Geary. All shares were held in escrow by Raymond J. Leaver, Esq., in accordance with the permit issued by the Corporation Commissioner. Three Way Distributors, Inc., did not own any interest in Black Magic.

In December, 1949, a discussion was had at the Bolen nursery between Miss Parks and Dr. and Mrs. Bolen regarding the acceptance of Black Magic by the public. Miss Parks reported that it had been well received and that she was convinced it had a great potential; she further stated that a franchise agreement was being worked out by which Three Way Distributors would be given the distribution of this commodity and would receive 5 per cent of the net sales price of all Black Magic products, whether sold through its agents or through representatives of Parks Manufacturing Company, the producer. This agreement was put in final form and executed under date of February 1, 1950.

During the course of conversations between Miss Parks and the Bolens the latter indicated they desired to invest $2,000 in this enterprise. Miss Parks stated to them that she had stock in Three Way Distributors, which was held in escrow, as above indicated, but which could be sold; and that she would be willing to sell 200 shares of this stock, at $10.00 a share, to the Bolens. The proposed deal was dis-

---

[1] It appears that Miss Barnes later acquired an interest in this company.

cussed by the parties a number of times. Before deciding to make the investment, Mrs. Bolen discussed the matter with her daughter, who had formerly owned and operated the nursery. After reaching a decision to make the investment, Dr. Bolen and Miss Parks consulted the Bolens' attorney, Wiley J. Shannon. As a result of this conference, Mr. Shannon prepared a promissory note for $2,000 dated January 27, 1950, payable to the order of Dr. Bolen. Miss Parks signed this note and also executed a mortgage securing it on certain vacant property that she owned in Hermosa Beach. In consummation of this phase of the transaction, the Bolens delivered to Miss Parks, on January 28, 1950, a cashier's check for $2,000.

On February 15, 1950, Mrs. Bolen delivered an additional $2,000 to Miss Parks in connection with this transaction. Whereupon, Mr. Shannon prepared a new promissory note and agreement which Miss Parks executed. This document was given the same date as the previous promissory note and mortgage. This last note and agreement was for $4,000 and intended to cover the initial investment of $2,000 as well as the additional advance of a like amount at that time. The second paragraph of this document reads as follows:

''The consideration for this note is the payment of $4,000.00 as the total purchase price of 400 shares of the capital stock of Three-Way Distributors, Inc., a California corporation in the name of Lillian R. Bolen, wife of the payee hereof, which said stock has heretofore been issued in her name[2] and is now held in escrow with Raymond J. Leaver, Attorney at Law, 6551 South Vermont Avenue, Los Angeles, California, under authority of the Corporation Commissioner of said State. Upon the delivery of said stock out of said escrow, it is understood and agreed that this note shall become null and void and delivered to the undersigned. Upon the delivery of said stock as aforesaid, it is further understood that no interest shall be due and payable upon this note.''

On February 27, 1950, an application was filed with the Commissioner of Corporations requesting authority to transfer in escrow 400 shares of the stock of Three Way Distributors from Miss Parks to Mrs. Bolen. This application was prepared by Mr. Cloud, attorney for Miss Parks, and sent

---

[2]The reference here appears to be erroneous. Apparently, it should have stated that the stock had theretofore been issued in the name of Miss Parks rather than in the name of Mrs. Bolen. Mr. Shannon's testimony so indicates.

by him to Mr. Shannon for his examination. Miss Parks acknowledged her execution of it before Mr. Shannon as a notary public. An order consenting to the requested transfer was issued by the Commissioner of Corporations on the following day.

On March 30, 1950, certificate Number 6 for 400 shares of stock in Three Way Distributors was issued transferring the same from Miss Parks to Mrs. Bolen. This certificate, together with the others, was held in escrow by Mr. Leaver.

On April 4, 1950, Mr. Shannon, apparently not knowing that the stock had been issued in the name of Mrs. Bolen, wrote Miss Parks requesting information as to when it would be issued. The pertinent portion of Mr. Shannon's letter reads as follows:

"Mr. and Mrs. Bolen called at the office the other day with reference to the issuance of the stock they purchased from you. Could you advise the undersigned when this stock will be issued to them. There is also some complaint, due to the fact that the additional $2000.00 was not incorporated in the mortgage issued by you as security for the stock. This last $2000.00, however, came up after the mortgage had been drawn. I presume you are now in position to issue the stock as agreed, upon which the mortgage will be satisfied. Would you kindly advise me when this may be done and the name of your Distributing Company by whom the stock is to be issued as I have forgotten the name."

On September 5, 1950, Shannon wrote[3] advising the Bolens that the stock had been transferred to Mrs. Bolen and was held in the escrow by Mr. Leaver.

On October 17, 1950, Mr. Shannon advised the Hermosa Beach Branch of the Bank of America that he was enclosing

---

[3]The letter in part reads:

"With reference to the purchase by Mrs. Bolen of certain stock in Three Way Distributors, Inc., from Martha E. Parks, will state that I examined the records in the office of the Corporation Commissioner and found that on the 28th of February, 1950, the Commissioner of Corporations consented to the transfer of 400 shares of Three Way Distributors, Inc., from Martha E. Parks to Lillian Bolen upon the condition that, when issued, the new certificates evidencing any of the shares therein authorized to be transferred, should be forthwith deposited with Raymond J. Leaver, Attorney-at-law, of Los Angeles, to be held in an escrow in accordance with the conditions of the permit issued to Three Way Distributors, Inc., on January 29th, 1948, and upon the further condition that the old certificates representing a like number of shares in the name of the transferee be immediately cancelled. . . .

"On August 24th, 1950, I wrote to Raymond J. Leaver to ascertain whether or not the new certificates were issued as authorized and were

satisfaction of mortgage in the sum of $2,000, dated January 27, 1950, in favor of Jacob A. Bolen, together with the mortgage and note, marked "PAID." This was the first note that Miss Parks executed, which was secured by the mortgage on her Hermosa Beach property.

Doctor and Mrs. Bolen attended a stockholders' meeting of Three Way Distributors on April 5, 1951.[4]

The corporation began paying dividends on May 1, 1951. Between that date and December 31, 1953, checks totaling $3,040 for eight dividends were received by plaintiff. These checks were drawn on the bank account of Three Way Distributors, Inc., in favor of plaintiff and each bears her endorsement. The checks indicated on their face that they were dividend checks.

In 1954, Three Way Distributors, Inc., was dissolved.[5] Plaintiff's proportionate interest in its assets, which consisted principally of its contract[6] for the distribution of Black Magic products, was assigned to her.

It appears that since the dissolution of Three Way Distributors, Inc., plaintiff has received checks totaling either $2,000 or $2,400 which, however, she has not cashed.

It was not until some five years after the Bolens made their deal with Miss Parks that plaintiff began to assert that she was the owner of a joint venture interest in the garden product known as Black Magic.

The basic question involved in this case is very simple: What was the deal that the Bolens and Miss Parks made? The answer is equally simple. It is provided by the factual determination of the trial court, namely, that the Bolens did not acquire any interest in Black Magic, or in any joint venture with Miss Parks for its manufacture and sale but rather that they acquired 400 shares of stock in Three Way Distributors, Inc. A résumé of the facts demonstrates that there

---

held by him in said escrow for your benefit. I am in receipt of a letter from him under date of August 25th, 1950, a copy of which is enclosed and which is self-explanatory.

"I do not recall whether or not the 400 shares covers all of the shares you were to receive. If not, will you please advise me so that we may take such steps as may be necessary to procure the additional shares."

[4]Dr. Bolen passed on prior to the trial of this action.

[5]Apparently this action was taken to effect an income tax saving.

[6]In 1952 Parks-Barnes, Inc., was organized and acquired from Parks Manufacturing Company the ownership of Black Magic. In 1953, Parks-Barnes, Inc., made a new contract with Three Way Distributors for the distribution of Black Magic products.

is ample evidentiary support for the trial court's finding and judgment. There is a conflict in the evidence, but that conflict has been resolved by the trial court, which resolution is, of course, binding upon this court.

There is, therefore, no merit in plaintiff's contention that the trial court erroneously found "that no venture agreement was made between appellant and respondents and that appellant never acquired any proprietary interest in Black Magic or the proceeds thereof." To reach this conclusion would require a reevaluation of the credibility of the witnesses, reweighing the testimony, and drawing inferences contrary to those drawn by the trial court. A reviewing court is not at liberty to do this.

These principles also adequately dispose of plaintiff's further contention that the trial court erred in failing to find "that the alleged agreement of sale and purchase of January 27, 1950, was a purported promissory note which had been fabricated sometime after March 6 or March 30, 1950, and was fraudulent and void."

Plaintiff contends that the following findings and conclusions are erroneous: (1) "That on January 27, 1950, appellant and respondents made a valid agreement whereby respondents sold and appellant purchased 400 shares of Three Way Distributors, Inc., for $4,000"; and (2) "That pursuant to such agreement respondents caused such shares to be validly transferred or delivered to appellant through such escrow." The simple answer to these contentions is that the court did not so find. The pertinent findings on this aspect of the transaction are quoted below.[7]

[7] "'That prior to, and in the month of January, 1950, the defendant Martha E. Parks was the owner and holder of certain shares of stock of the Three Way Distributors, Inc., said shares of stock having been issued pursuant to authorization from the Corporation Commission of the State of California, and that during the month of January, 1950, said shares were impounded in an escrow with Ray J. Leaver, as escrow holder, and that prior to and during the month of January, 1950, the defendant Martha E. Parks did negotiate with the plaintiff herein and with plaintiff's husband Jacob A. Bolen for the sale to plaintiff of shares of the stock then owned by Martha E. Parks of said Three Way Distributors, Inc. That following negotiations with the plaintiff and her husband, plaintiff and her husband did offer to purchase from Martha E. Parks, and she agreed to sell, 400 shares of her stock in Three Way Distributors, Inc., at $10.00 per share, making a total of $4,000.00, said stock to be transferred to plaintiff's name, and that pursuant to said agreement plaintiff and her husband did pay to Martha E. Parks the sum of $4,000.00, and Martha E. Parks did cause to be transferred and delivered to the plaintiff in said escrow 400 shares of her stock in Three Way Distributors, Inc. That at all times during said negotiations and in the purchase of said shares of stock, plaintiff

Upon reading these findings it is apparent that the court did not make any finding as to the validity of the agreement for the purchase and sale of the 400 shares of stock or as to the validity of the transfer of such stock in escrow. In this connection plaintiff asserts that the trial court erred in omitting to find that no permit was sought or obtained prior to the sale of shares. In declining to enlarge the scope of its findings, the trial court, in its conclusions, expressly stated that "Findings upon issues other than those embraced in [its] Findings, would be immaterial and are not made for that reason." This adequately explains and properly justifies the refusal of the trial court to make any finding on this subject. The principal, if not the only, question in controversy in this case was whether plaintiff had invested in a joint venture or had made a stock purchase. In this proceeding plaintiff sought a declaration of rights and duties in respect to her contention that she had a 40 per cent proprietary interest in Black Magic as a joint venturer. She did not elect to join herein any claim she might have had for rescission or damages based on a void stock transaction, as section 1060 of the Code of Civil Procedure permitted her to do. Defendants did not by their answer enlarge the issues, but merely joined issue as tendered, and alleged their version of the transaction. In this posture of the case the court's findings fully disposed of the controversy presented to the court. It was therefore unnecessary for the court to make any finding as to whether or not the stock transfer was made pursuant to a permit, and whether or not such transfer was valid.

Plaintiff's major thesis is that any agreement to sell or transfer Miss Park's escrowed stock in Three Way Distributors, Inc., was criminal, fraudulent and void by reason of the fact that the consent of the Corporation Commissioner had not been first obtained. She then reasons that the parties must have contemplated a valid agreement. Therefore, she

and her husband were represented by legal counsel of their own selection, were fully advised and well knew that they were purchasing only shares of capital stock of Three Way Distributors, Inc., from the defendant Martha E. Parks. That at no time was there any understanding or agreement concerning a joint venture, or any other venture, or association between the defendant Martha E. Parks, or any of the other defendants, and the plaintiff or her husband; and at no time was there any agreement for a division of profit or profits between the defendant Martha E. Parks and the plaintiff, and no understanding other than that dividends might be received by the plaintiff, arising from her ownership of said shares of stock in Three Way Distributors, Inc."

argues, her version of the transaction must be accepted as the agreement between the parties because this is the only way the taint of illegality may be avoided.

In making this approach, plaintiff by-passes the real question before the court, viz., What was the transaction between the Bolens and Miss Parks. After listening to the testimony relative to the inception and consummation of this deal, examining the documents executed to implement it, and considering the subsequent conduct of the parties in terms of their business relationship over a period of years, the trial court found that the real transaction was a purchase and sale of stock in Three Way Distributors and that the Bolens did not purchase an interest in Black Magic or in any venture for its production and sale. The evidence overwhelmingly supports this finding. The trial court was not required, in the face of the welter of documentary proof and convincing testimony showing the transaction to be a purchase of stock, to adopt an interpretation which would transmute the agreement into a relationship other than that plainly intended by the parties themselves. (*General Motors Accept. Corp.* v. *Codiga,* 62 Cal. App. 117, 120 [216 P. 383].) ■ As stated in *Martin* v. *Palmer Union Oil Co.,* 184 Cal. 386, 389 [193 P. 950], ''The rule, of course, is that when a contract is equally capable of two constructions, one of which will make it illegal and the other not, the latter is to be preferred and adopted. But this is a rule of construction and has no application to a case where the intent of the parties is plain . . .'' This statement is here applicable.

■ No court is empowered to make for the parties to a transaction an agreement which they did not see fit to make. (*Pauley* v. *Faucett,* 124 Cal.App.2d 406, 410 [269 P.2d 89].) Its function is to ascertain and declare the nature of the transaction actually made. This was what the court did in the instant matter.

■ Plaintiff argues that the finding and conclusion that she is ''estopped from asserting any claim to any interest in Black Magic'' is erroneous. Since the findings, on substantial evidence, that plaintiff did not acquire any interest in Black Magic and that no joint venture in respect to that product was entered upon by the parties, amply support the judgment, it becomes immaterial whether the challenged finding was justified by the evidence. ■ It is fundamental that if a judgment is supported by findings based on substantial evidence, questions relative to other findings may be disregarded

on appeal as immaterial. (*Logan* v. *Forster*, 114 Cal.App.2d 587, 602 [250 P.2d 730]; *Bohn* v. *Watson*, 130 Cal.App.2d 24, 41 [278 P.2d 454].) ▮ Furthermore, "it has been consistently held that a judgment will not be reversed because a conclusion is not legally sound, if the judgment is in fact a proper one. [Citations.]" (*Bohn* v. *Watson, supra,* p. 42.)

The judgment is affirmed.

Moore, P. J., and Ashburn, J., concurred.

A petition for a rehearing was denied April 17, 1957, and appellant's petition for a hearing by the Supreme Court was denied May 22, 1957.